UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

ERIC LUEDIKE, HEATHER WARD,　　　　)
DONALD TRAINER, III, DEBRA HARTLEY,)
and ERIC BENDER, on behalf of　　　　)
themselves and all others similarly situated, )
　　　　　　Plaintiffs,　　　　　　)
　　　　　　　　　　　　　　　　)
　　vs.　　　　　　　　　　　　)　　　　1:07-cv-1082-LJM-DML
　　　　　　　　　　　　　　　　)
SPRINT NEXTEL CORPORATION,　　　)
　　　　　　Defendant.　　　　　　)

## ORDER ON DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

This matter comes before the Court on defendants', Sprint United Management Company and Nextel Retail Stores, LLC (apparently improperly named as Sprint Nextel Corporation ("Sprint Nextel") (collectively, "Defendant"), Motions for Summary Judgment (Dkt. Nos. 100, 103, 106) pursuant to Federal Rule of Civil Procedure 56(c) ("Rule 56(c)"). Plaintiffs, Eric Luedike ("Luedike"), Heather Ward ("Ward"), Donald Trainer, III ("Trainer"), Debra Hartley ("Hartley"), and Eric Bender ("Bender"), on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"), initiated this proposed class action against Defendant alleging Defendant improperly failed to pay wages to Plaintiffs in violation of Indiana Wage Payment statute, Ind. Code § 22-2-5 *et. seq.*  The Court has not certified a class in this matter; therefore, only the named plaintiffs' claims are at issue in these Motions.

Plaintiffs initially pursued relief under two theories: (1) that Sprint made untimely payments of accrued vacation or paid time off following Plaintiffs' termination of employment; and (2) that Sprint made untimely payments of incentive-based compensation

during the course of Plaintiffs' employment.  On March 4, 2009, the Court dismissed Plaintiffs' claims under the first theory.  Dkt. No. 133; *see also* Dkt. No. 142 (denying Plaintiffs' Motion to Reconsider the Court's Order on Defendant's Motion to Dismiss).  Therefore, the current Motions for Summary Judgment only address the second theory, which necessarily turns on one issue: whether the commission plans utilized by Sprint constitute "wages" under Ind. Code § 22-2-5-1(b) (the "Ten Day Rule").  The Ten Day Rule requires an employer to pay an employee all wages earned during a specific time period within ten business days of the end of that time period.  The Court rules as follows.

# I.  BACKGROUND

The underlying facts are largely undisputed.  However, the commission plans, or incentive based pay plans, under which each plaintiff operated varied depending on his or her dates of employment and the position he or she held.  Therefore, the Court groups individual plaintiffs together to the extent they share common facts.

## A.  SPRINT NEXTEL CORPORATION

Sprint Nextel was officially formed on August 12, 2005, when Sprint United Management Company merged with Nextel Retail Stores, LLC.  Prior to the merger, Sprint Nextel consisted of two distinct entities, Nextel and Sprint.   In Indiana, Nextel's retail locations were staffed by the company Nextel Retail Stores, which was a separate legal entity from Nextel.  Similarly, Sprint's retail locations were staffed by employees of Sprint United Management Company, a separate legal entity from Sprint.  After the merger, all Sprint Nextel employees who came from Nextel Retail Stores were referred to as "legacy

Nextel" employees, while employees from Sprint United Management Company were referred to as "legacy Sprint" employees.

Sprint's incentive-based compensation plans consisted of two parts: (1) a Master Incentive-based compensation Guide (the "Guide"), and (2) individual Commission Acknowledgment Forms ("CAFs"). Dkt. No. 105-1 at 22. The Guide reflected the general terms and conditions associated with sales-based bonus payments. *Id.* The CAFs outlined the goals, limits, and elements of each particular position's incentive-based compensation. *Id.* The Guide and CAFs formed the incentive-based compensation plan for Sprint Retail employees. *Id.* Discrepancies between the Guide and the CAF were controlled by the CAF. *Id.* at 173.

## B.  WARD

Ward began her employment with Defendant on December 19, 2005, and remained continuously employed until April 5, 2007. Dkt. No. 105-5 ("Ward Dep.") at 19-20. From December 19, 2005, to August 2006, Defendant employed Ward as a Store Host. *Id.* at 21. From August 2006, to April 5, 2007, Defendant employed Ward as a Retail Consultant, or a frontline salesperson. *Id.* at 21-22. During her employment, Ward earned an hourly wage and incentive-based compensation. *Id.* at 23-24, 26.

### 1.  <u>Store Host</u>

From July 12, 2004, through May 1, 2006, Defendant's store hosts were paid a monthly guarantied payment of $450.00. Dkt. No. 105-1 at 32-33. According to Defendant,

this payment operated as a retention bonus. *Id.* at 32. To be eligible for the retention payment, Ward electronically signed the 2004 CAF for Store Hosts (the "2004 Host CAF"). Dkt. No. 105-6, ¶¶ 5-6. In addition, Ward needed to meet other eligibility requirements listed in the 2005 version of the Guide (the "2005 Guide") to receive incentive-based compensation payments. Dkt. Nos. 105-9 at 6-7, 31-32; 105-10 at 17. Thus, to receive the monthly payment, Ward needed to (1) be employed during the measurement month and (2) meet the eligibility requirements at the time of the monthly payment under the Guide. As to the first requirement, the only determining factor was the total number of weeks during a given month that Ward was employed, irrespective of the number of hours actually worked. Dkt. No. 105-1 at 32-33. In other words, as long as Ward remained employed for the entire month, she met the first requirement for eligibility. *Id.* The Defendant measured and paid the retention payment on a monthly basis. *Id.*

On May 1, 2006, the Defendant issued a new Guide (the "2006 Guide") and CAF for Hosts (the "2006 Host CAF"). *Id.* at 24-25; Dkt. No. 105-9, Exs. 26 and 59. Although the eligibility requirements for the retention payment remained the same, the Defendant reduced the amount of the payment from $450.00 to $250.00. Dkt. No. 105-1 at 37. However, under the 2006 Guide and 2006 Host CAF, Ward could earn additional payment derived from the results of a customer satisfaction survey performed each month. Ward Dep. at 38; Dkt. No. 105-9, Ex. 59. The Defendant hired a third-party agency to conduct surveys of recent customers. Dkt. No. 105-1 at 40-42. If the store at which a particular Host worked received a certain positive rating, the Host and all other employees in the store received additional incentive-based compensation. *Id.* at 59-60. According to

Defendant, it usually would not receive the results of the customer satisfaction results until at least the month after the measurement month.  *Id.* at 41-42.

## 2.  Retail Consultant

In August of 2006, Ward transferred to the position of Retail Consultant.  Ward Dep. at 21.  As a result, she was eligible to participate in Defendant's full incentive-based compensation plan, subject to the terms and conditions of the 2006 Guide and the 2006 CAF for the Retail Consultant position (the "2006 Consultant CAF").  Dkt. Nos. 105-1 at 47-48; 105-9 and -10, Exs. 26 and 61.  The 2006 Guide and 2006 Consultant CAF explained in detail the formula used to calculate Ward's incentive-based compensation payment.  *Id.*

As a Retail Consultant in 2006, Ward's incentive-based compensation consisted of four basic elements:

(1) **Net Activation Opportunity Payments** – "Net Activations" was defined by the 2006 Guide as the total number of Activations– events where new subscribers are entered into the Defendant's billing system following activation by the subscriber–"in a given period minus any transfers of credit due to an erroneous entry, fraudulent Activations by a sales representative or managers, or Activations of Unauthorized Rate Plans during the same period."  Dkt. No. 105-9, Ex. 26 at 6, 8.

(2) **Recurring Revenue Opportunity Payments** – Recurring revenue includes revenue from certain items and services sold or activated from the Retail Consultant's assigned store location during the measurement month. Examples included add-on features to standard billing plans, such as text messaging, that generate a monthly source of income.  Dkt. No. 105-10, Ex. 60 at 101-02.

(3) **Non-Recurring Revenue Opportunity Payment** – Non-recurring revenue includes revenue from the one-time sale of certain items.  Examples include revenue generated from the sale of a wireless headset.  Dkt. No. 105-10, Ex. 60 at 102-03.

5

**(4) Customer Satisfaction Opportunity Payments** – This incentive payment is identical to the payment available to Store Hosts as described above.

In addition to these four basis elements, Ward was eligible for incentive-based compensation derived from sales promotions called "spifs," which usually involved a specific product or service for which the company had an immediate interest in increasing sales. Ward Dep. at 64-66. For spif promotions, Ward would receive a flat amount per item sold or a percentage of the sale. Dkt. No. 105-3 at 213-15. Ward participated in only a few spif promotions during her tenure as a Retail Consultant. Ward Dep. at 64-65.

Ward received an incentive-based compensation payment each month, according to an estimation of commissionable transactions that took place the prior month. Ward Dep. at 49; Dkt. No. 105-9 and 10, Ex. 26. Sprint asserts this monthly payment was merely an advance, subject to revocation and return, because Sprint did not consider a transaction a "commissionable event" until there was "a match of records . . . in the commission system between the Company inventory or Point of Sale tracking systems and the Company customer billing system." Dkt. No. 105-1, -2, -3, at 83, 152-53, 190, 193; Ward Dep. 45; Dkt. No. 105-9 and -10, Ex. Dep 26. For example, the sale of a telephone handset would only count toward incentive-based compensation after it was activated by the customer. Once activated, the device had to remain active for at least fourteen days to be considered a commissionable event. If the customer canceled the account within fourteen days, the Retail Consultant lost the incentive-based compensation for the transaction. *Id.* Ultimately, if a customer returned a particular commissionable item, cancelled an activation, or in some other way rendered a transaction void, a Retail Consultant such as Ward did not earn incentive-based compensation. Ward Dep at 45-48; Dkt. No. 105-9 and -10, Exs. 26, 61.

6

Sprint employees, including Ward, could earn each component of their particular incentive-based compensation separately.  In other words, each component was independent from all other components.  Dkt. No. 148-1 at 110.

The 2006 Guide explained the provisional nature of Ward's monthly incentive payments:

> You are ineligible for Incentive compensation on a particular Activation when any of the following events occur: an erroneous data entry where you received credit for an Activation or sale to which you were not entitled; a fraudulent Activation by you (or in the case of management, by you or one of your reps); or an Activation of an Unauthorized Rate Plan. . . . If any of these events occur, any Incentive-based compensation paid to you at the time of the Activation will be "charged back" or recouped by the Company. To recoup any Incentive-based compensation paid but not earned, the Chargeback will offset any Activation(s) made by you in the month the Chargeback occurs.

Dkt. No. 105-9 at 10.  The reconciliation period, during which the decision regarding the finality of a commission payment was actually made, often took longer than ten days.  Dkt. No. 105-1,-2, -3, at 59-59, 102-06, and 134-35.  As the 2006 Guide explained:

> There may be a delay in determining whether certain activities qualify as Commissionable Events or if payments are earned under the Plan.  By participating in the Plan, you agree that any delay in determining if a payment is earned under the Plan is reasonable and necessary for the proper administration of the Plan.

Dkt. No. 105-10, Ex. 26 at 15.

Defendant utilized a computer system, the GERS system, to track the sales on which commissions were earned.  In general, an employee could view their sales the day after the sale occurred.  Dkt. No. 102-5 at 50.

In February 2007, Sprint amended the applicable CAFs for its employees, including Retail Consultants.[1]  Dkt. No. 105-10, Ex. 60.  The 2007 Consultant CAF contained two substantive changes to the 2006 Consultant CAF.  First, Sprint removed the customer satisfaction survey.  Second, Sprint added language stating that a Retail Consultant would not earn incentive-based compensation for sales until 180 days after the transaction occurred.  *Id.*  Nevertheless, Sprint continued to calculate estimated sales every month and made advance payments based on those estimates one month in arrears.  *Id.*

## C.  BENDER, LUEDIKE, AND TRAINER

Bender and Luedike were Nextel Store Managers prior to the merger.  Effective May 1, 2006, Store Manager positions with post-merger Sprint were classified as "A," "B," and "C."  The A, B, and C positions referred to legacy-Nextel employees, such as Bender and Luedike, and whether Sprint classified the store manager an A, B, or C Store Manager depended on the volume of sales made in the store where the manager worked.  "A" stores had the largest volume of sales, while "C" stores had the smallest.  Accordingly, "A" level managers were eligible for a higher level of incentive-based compensation than other managers.  Bender and Luedike held Store Manager "C" positions, while Trainor was a Store Manager "A."  With that background in mind, the Court considers Defendant's incentive-based compensation system both pre- and post-merger with respect to the Store Manager position.

─────────────────────

[1] Sprint amended the Consultant CAF again on March 1, 2007; however, the February and March versions are identical, except the March version increased the monthly target for incentive-based compensation.

### 1. Pre-Merger Nextel Store Manager

Before the merger, Bender and Luedike operated under Nextel's 2005 Sales Compensation Plan for Store Managers (the "Nextel Manager Policy").  Dkt No. 102-3 ("Bender Dep.") at 35, 38; Dkt. No. 102-5 ("Luedike Dep.") at 36-37; Dkt. No. 102-6, Ex. 22. Under the Nextel Managers Policy, Managers received a single incentive-based compensation payment for each month, which was comprised of five components: (1) Store Gross Unit Activations (Store Measurement Component); (2) Individual Percentage of Store Gross Unit Activations (Individual Measurement Component); (3) Store Gross Data Activations (Store Measurement Component); (4) Store Net Accessory Revenue (Store Measurement Component); and (5) Store Inventory Management (Store Measurement Component).  Dkt. No. 102-6, Ex. 22 at 3.

Nextel based a Store Manager's incentive-based compensation payments under the Nextel Manager Policy on the ability of the store sales employees to meet sales goals and minimize unexpected losses over the course of a month.  *Id.* at 1-5.  Nextel calculated the incentive-based compensation from store-based sales on a "roll-up" basis, meaning the more unit activations, data activation, and accessory revenue generated by the stores as a whole, the more incentive-based compensation Luedike and Bender received.  *Id.*; Dkt. No. 102-1 at 115-17.  Similar to the incentive-based compensation scheme for Hosts and Retail Consultants, incentive-based compensation payments under the Nextel Manager Policy were provisional, because all sales were subject to customer returns, replacements, or other actions that might void the original transaction, thereby eliminating the commission for the sale.  Dkt. No. 102-6, Ex. 22 at 5.  As a result, as with Ward's incentive-based

compensation, the reconciliation process under the Nextel Manager Policy took several weeks.

Apart from the Nextel Manger Policy, Luedike and Bender also received incentive-based compensation from "Boost" sales–sales tied to specific items and services available only in designated markets–and "spif" promotions.  Boost sales had three components: (1) Store Gross Boost Handset and SIM Card Activations (monthly); (2) Individual Gross Boost Handset and SIM Card Activations (bi-weekly); and (3) Individual Gross ReBoost Card Revenue (bi-weekly).  Dkt. No. 102-6, Ex. 23 at 1-2.  Incentive-based compensation derived from the first component was based entirely on the store's monthly performance and dispersed at the same time as the incentive-based compensation under the Nextel Manager's Policy.  Incentive-based compensation derived from the two individual components was based on the Manager's individual sales efforts and were measured and paid bi-weekly.  *Id.;* Bender Dep. at 110; Luedike Dep. at 47-48.  Luedike's and Bender's incentive-based compensations for "spif" sales operated the same way as Ward's spif payments.  *See supra*, section III.B.2.

### 2. Post-Merger Sprint-Nextel Store Managers

As with the Host and Retail Consultant positions, post-merger Store Manager positions operated under the Guide and the CAFs specific to Store Managers (the "Manager CAFs").  Luedike, Bender, and Trainer all electronically acknowledged and agreed to be bound by the applicable Managers CAFs before receiving incentive-based compensation.  Dkt. No. 102-13, Ex. F, ¶¶ 6, 8-9.

Under the applicable Guide and Manager CAF, Sprint based incentive-based compensation for Store Managers on the customer satisfaction survey results from the store and the total number of commissionable sales made by all the sales employees in that store during a particular month.  Dkt. No. 102-6 through -12, Exs. 29-30, 52-53, 55. Sprint derived the store sales component of this compensation from (1) activations, (2) recurring revenue products and services; and (3) non-recurring revenue products and services.  *Id.*  After a February 1, 2007, amendment, the incentive derived from the customer satisfaction survey was removed from the store managers' incentive-based compensation.  However, on June 1, 2007, Sprint added incentive-based compensation for "churn," the sale of an upgraded phone or a contract renewal.  Dkt. No. 102-11, Ex. 55. Finally, as with the other positions, Sprint store managers were eligible for incentive-based compensation due to spif promotions.  However, the store managers were not paid directly for their own sales efforts; rather, they received incentive-based compensation based on the combined efforts and success of all their sales employees.  Dkt. No. 102-1 at 218-19. Similar to the positions discussed above, the incentive-based compensation for store managers, which Sprint paid in advance, was subject to reconciliation.

### D.  HARTLEY AND TRAINER

Prior to the merger, and during the relevant time period, Hartley worked as a District Manager ("DM") for Nextel Retail Stores.  After the merger on September 1, 2005, her title officially changed to Retail Sales Managers ("RSM").  She remained in this position until February 2, 2006, when she left on disability leave and never returned.  Before Trainer moved into a Store Manager position in August 2006, as discussed above, he was a DM

for Nextel Retail Stores, LLC in Cleveland Ohio.  In March 2006, Trainer transferred to Indiana and worked temporarily as an acting RSM for Sprint.  Both Hartley and Trainer earned salaries in addition to whatever incentive-based compensation they received.  With that background in mind, the Court considers Defendant's incentive-based compensation system both pre- and post-merger with respect to these district level positions.

### 1.  Pre-Merger District Manager

As a Nextel District Manager, Hartley's incentive-based compensation was governed by a position-specific policy, Nextel's March 2005 Sales Compensation Plan for District Managers (the "DM Plan").  Dkt. No. 108-5, Ex. 5.  Under the DM Plan, Nextel paid its district managers incentive-based compensation based upon the ability of the stores in the district manager's district to reach company-set goals in five areas: (1) Store Gross Data Activations; (2) Store Manager Individual Gross Unit Activations; (3) Store Gross Data Activations; (4) Store Net Accessory Revenue; and (5) Store Inventory Management.  Each of these goals were independent of one another and the corresponding compensation could be earned separately. *Id.*  Hartley was also eligible for incentive-based compensation associated with the sale of spifs, similar to the positions discussed above.  Dkt. No. 108-4 ("Hartley Dep.") at 94-98.  None of the incentive-based compensation Hartley received was derived directly from her own sales efforts.  Rather, all components of the DM Plan were based on the efforts of the salespeople and the performance of the stores within Hartley's district.  Dkt. No. 108-5, Ex. 5.

As with the positions explained above, Hartley incentive-based compensation payments were in advance of actual incentives earned and, therefore, were subject to reconciliation.  Dkt. No. 108-5, Ex. 5.

### 2.  Post-Merger District Level Manager

Starting September 1, 2005, Sprint reclassified all DMs employed by Nextel as RSMs.  Hartley and Trainer were RSMs, and thus earned incentive-based compensation, similar to the Sprint positions discussed above, under the 2005 Guide and 2005 CAF for RSMs (the "2005 RSM CAF").  Dkt. No. 108-5 through -11, Exs. 8, 26, 50, and 75.  Hartley left Sprint before the 2006 Guide went into effect, but Trainer worked as a RSM under both the 2005 and 2006 Guides.

As RSMs, Harley and Trainer could earn incentive-based compensation on the following components: (1) Net Activations; (2) Recurring Revenue; (3) Non-Recurring Revenue; and (4) Customer Satisfaction.  *Id.*  As with the other positions discussed above, Hartley and Trainer were also eligible for incentive-based compensation based upon their stores' spif sales.  Dkt. No. 108-1 at 212-13.  Similar to all Nextel District Managers, Hartley and Trainer earned incentive-based compensation not from their personal sales record, but from the sales and efforts of the RSM's district as a whole.  Dkt. No. 108-5 through -11, Exs. 8, 26, 50, and 75.

Sprint calculated incentive-based compensation payments for RSMs on a monthly basis.  Transactions that were initially thought to be compensable could later became void due to a return, cancellation, fraud, or employee appeal; therefore, the incentive-based compensation payment was subject to reconciliation.  Dkt. No. 108-5 and - 6, Exs. 8, 26.

13

Sprint maintains that no portion of the incentive-based compensation was earned until all adjustments were made and a match occurred between the point-of-sale computer system and the commissions computer system.

## II. STANDARDS

### A. SUMMARY JUDGMENT

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see CAE Screenplates v. Heinrich Fiedler GMBH*, 224 F.3d 1308, 1316 (Fed. Cir. 2000).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the opposing party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law.  *See id.*

The moving party has the initial burden to show the absence of genuine issues of material fact.  *See Wollin v. Gondert*, 192 F.3d 616, 620 (7th Cir. 1999); *Schroeder v. Barth*, 969 F.2d 421, 423 (7th Cir. 1992).  This burden does not entail producing evidence to negate claims on which the opposing party has the burden of proof.  *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n.3 (7th Cir. 1994).  The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of material fact exists.  *See Wollin*, 192 F.3d at 621; *Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1031 (7th Cir. 1998); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Scherer v. Rockwell Int'l Corp.*, 975 F.2d

14

356, 360 (7th Cir. 1992).  The opposing party must "go beyond the pleadings" and set forth specific facts to show that a genuine issue exists.  *See Wollin*, 192 F.3d at 621; *Stop-N-Go of Madison, Inc. v. Uno-Ven Co.*, 184 F.3d 672, 677 (7th Cir. 1999); *Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993), *cert. denied*, 511 U.S. 1005 (1994).  This burden cannot be met with conclusory statements or speculation, *see Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 408 (7th Cir. 1994) (citing *McDonnell v. Cournia*, 990 F.2d 963, 969 (7th Cir. 1993)); *accord Chapple v. Nat'l Starch & Chem. Co.*, 178 F.3d 501, 504 (7th Cir. 1999); *Weihaupt v. Am. Med. Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989), but only with appropriate citations to relevant admissible evidence.  *See* Local Rule 56.1; *Brasic v. Heinemann's Inc., Bakeries*, 121 F.3d 281, 286 (7th Cir. 1997); *Foreman v. Richmond Police Dept.*, 104 F.3d 950, 957 (7th Cir. 1997); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923-24 (7th Cir. 1994).  Evidence sufficient to support every essential element of the claims on which the opposing party bears the burden of proof must be cited.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In considering a summary judgment motion, a court must draw all reasonable inferences in the light most favorable to the opposing party.  *See Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1999); *Wollin*, 192 F.3d at 621; *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998); *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992).  If a reasonable fact finder could find for the opposing party, then summary judgment is inappropriate.  *Stop-N-Go*, 184 F.3d at 677; *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).  When the standard embraced in Rule 56(c) is met, summary judgment is mandatory.  *Celotex*

15

*Corp.*, 477 U.S. at 322-23; *Thomas & Betts*, 138 F.3d at 291; *Shields Enters.*, 975 F.2d at 1294.

## B.  INDIANA'S WAGE PAYMENT STATUTE

Indiana's Wage Payment Statute requires "[e]very person, firm, corporation, limited liability company, or association, their trustees, lessees, or receivers appointed by any court, doing business in Indiana, [to] pay each employee at least semimonthly or biweekly, if requested, the amount due the employee."  Ind. Code 22-2-5-1.  Pursuant to the Ten Day Rule, "[p]ayment must be made for all wages earned to a date not more than ten (10) business days prior to the date of payment."  Failure to comply with the Wage Payment Statute, specifically the Ten Day Rule, subjects an employer to liability under Indiana Code Section 22-5-5-2, which provides:

> Every such person, firm, corporation, limited liability company, or association who shall fail to make payment of wages to any such employee as provided in section 1 of this chapter shall, as liquidated damages for such failure, pay to such employee for each day that the amount due to him remains unpaid ten percent (10%) of the amount due to him in addition thereto, not exceeding double the amount of wages due[.]

A plaintiff alleging a violation of Indiana's Wage Payment Statute can prevail only if the compensation to which the plaintiff was entitled qualifies as "wages" under the statute, which defines "wage" as "all amounts at which the labor or service rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or in any other method of calculating such amount."  Ind. Code § 22-2-9-1; *see Highhouse v. Midwest Orthopedic Institute, P.C.*, 807 N.E.2d 737, 739 (Ind. 2004).  In *Highhouse*, the Indiana Supreme Court considered the Ten Day Rule's application to an

16

employee's bonus, the amount of which depended on the employer's overall operational expenses.  The court stated that "a 'bonus' is a wage 'if it is compensation for time worked and is not linked to a contingency such as the financial success of the company.'" *Highhouse*, 807 N.E.2d at 740 (quoting *Pyle v. Nat. Wine & Spirits Corp.*,637 N.E.2d 1298, 1300 (Ind. Ct. App. 1994)).  Therefore, the bonus at issue was not a "wage" under the Indiana Wage Payment Statute because its calculation depended on the expenses of the overall operations of the employer.  *Id.*  Moreover, rather than just providing a deadline for the payment of wages, the Ten Day Rule actually informed what types of compensation qualify as "wages" under the statute.  *Id.* Thus, court held that the bonus did not constitute a "wage" under the Indiana Wage Payment Statute because the employer could not determine the whether the employee was entitled to the bonus within the ten day period. *Highhouse*, 807 N.E.2d at 740.

In *Gress v. Fabcon, Inc.*, 826 N.E.2d 1, 3-4 (Ind. Ct. App. 2005), the court applied *Highhouse* to sales commissions and concluded that a sales manager's commissions were not "wages" under the Wage Payment Statute because the commissions were linked to the profitability of the projects the manager procured.  Although the statutory definition of wages included "commissions," and the employer referred to the sales manager's compensation as a commission, the Court concluded that the substance of the compensation, rather than its name, controls.  *Gress*, 826 N.E.2d at 3.

Although subsequent decisions of the Indiana Court of Appeals have disagreed with the *Gress* court's holding, *see Prime Mortg. U.S.A., Inc. v. Nichols*, 885 N.E.2d 628 (listing decisions of the Court of Appeals that disagree with *Gress*), courts in this district have nevertheless agreed with the *Gress* court's analysis of *Highhouse*.  *See, e.g., Thomas v.*

*H&R Block Eastern Enterprises, Inc.*, Cause No. 1:08-cv-0667-DFH-DML, 2009 WL 2856485, *5-6 (S.D. Ind. Aug. 28, 2009) (C.J. Hamilton).   *See also Rumler v. General Revenue Corp.*, Cause No. 1:05-cv-1248-JDT-TAB, 2007 WL 1266747, *1, *5-*6 (S.D. Ind. May 1, 2007) (J. Tinder) (applying *Highhouse* to "'bonus program' . . . similar to commission programs often used to compensate those working in the sales field.").   The Court concludes that the *Gress* court's analysis and holding are consistent with *Highhouse*, and will apply the analysis and reasoning of *Highhouse* and *Gress* in this case.

### III. DISCUSSION

#### A. GUARANTEED PAYMENT APPLICABLE TO STORE HOSTS

Ward received a "guaranteed" payment for continued employment under the 2005 and 2006 Guides, and 2005 and 2006 Host CAF.  These payments were measured and paid on a monthly basis,  and continued eligibility for the monthly payment depended on (1) employment during the measurement month and (2) satisfaction of certain eligibility requirement in the Guide.  Dkt. Nos. 105-9 at 6-7, 31-32; 105-10 at 17.  Defendant argues that Ward's Guaranteed Payment as a Store Host did not qualify as a "wage" because Ward earned the bonus regardless of the number of hours she worked.  Defendant contends that it made no difference whether Ward took paid or unpaid leave during the month, or worked ten, twenty, or forty hours a week.  "The only determining factor," Defendant submits, "was the total number of weeks during a given month Ward was employed." Def.'s Br. at 4.  Therefore, the Guaranteed payment was not compensation for time worked.

However, the Host CAFs required Ward to comply with the 2005 and 2006 Guides' eligibility requirements.  Therefore, in order to receive the Guarantee Payment, a Store Host such as Ward must, among other things, "perform[ ] the duties of a position eligible for Incentive-based compensation under the Plan." Dkt. 105-9 at 7.  Accordingly, continued employment alone was insufficient to be eligible for the Guaranteed Payment.  Rather, the employee not only had to be continuously employed as a Store Host, he or she also had to perform the duties of the Store Host and, as such, this compensation depended on work actually performed.

Moreover, similar to the bonus at issue in *Highhouse*, the Ten Day Rule informs the Court whether the Guaranteed Payment was a "wage" under the Indiana Wage Payment Statute.  807 N.E.2d at 740.  A Store Host who worked during a measurement month earned the Guaranteed Payment the day the measurement month ended.  It was not subject to reconciliation.  Consequently, Defendant could calculate the compensation Ward earned within ten days of the end of the measurement month.  Contrary to Defendant's contention, the Guaranteed Payment was not deferred compensation.  Unlike common forms of deferred compensation, *see Taylor v. Community Hospitals of Indiana, Inc.*, 860 N.E.2d 1200, 1203 (Ind. Ct. App. 2007) ("Common forms of deferred compensation include various forms of PTO, pension benefits, retirement savings plans, stock options, healthcare plans, annuities, etc."), the Guaranteed Payment was not contingent upon a future event.  As soon as Ward worked one day during the measurement month, she was entitled to the Guaranteed Payment, at least on a prorated basis.  Therefore, this case is different than the case upon which Defendant relies, *Swift v. Speedway Supreamerica, LLC*, 861 N.E.2d 1212, 1215-16 (Ind. Ct. App. 2007).

19

The Court concludes that the Guaranteed Payment portion of Ward's compensation as a Store Host qualifies as a "wage" under the Indiana Wage Payment Statute.  The Defendant's Motion for Summary Judgment on this issue is **DENIED**.

### B.  INDIVIDUAL SALES COMMISSIONS, SPIFS, AND CUSTOMER SATISFACTION BONUS

As discussed above, Ward, Bender, Luedike, and Trainer were eligible for incentive-based compensation based upon their individual sales numbers, including spifs.  For example, Retail Consultants and Store Managers would receive commissions for the sale of a headset or the activation of any account.  However, the undisputed facts demonstrate that all of incentive-based compensation for individual sales numbers was subject to reconciliation.  Thus, for instance, if a customer to whom Ward sold a headset returned the headset for a refund, Ward would not receive compensation for the sale.

Defendant submits that the reconciliation process takes longer than ten days because customers have well over ten days to cancel an activation or sale.  Therefore, under *Highhouse* and *Gress*, these sales commissions do not fall under the Ten Day Rule.  The Court agrees.  Ultimately, the individual sales commissions are linked to a contingency; namely, that the customer will not cancel their transaction.  Furthermore, although the Defendant's GERS system for tracking sales commissions enables Defendant to determine an employee's sales commissions the day after a sale is made, it does not recognize the potential for reconciliation.  The GERS system merely represents an estimation of the compensation due to an employee.  As a result, the individual sales commissions do not qualify as "wages" under the Indiana Wage Payment Statute, and the Ten Rule Day does

20

not apply.  *Highhouse*, 807 N.E.2d at 740.  *See also Herremans v. Carrera Designs, Inc.*, 157 F.3d 1118, 1121-22 (7th Cir. 1998) (cited with approval by *Highhouse* for the proposition that pay based on profits rather than a claimant's own time, effort, or product was not a wage); *Manzon v. Stant Corp.*, 138 F.Supp.2d 1110, 1113 (S.D. Ind. 2001) (cited with approval by *Highhouse* for the proposition that a bonus based on a financial target and achieving "individual personal objectives" was not a wage).

Moreover, contrary to Plaintiffs' argument that because the statutory definition of "wage" identifies "commissions", the individual sales commissions at issue here constitute "wages" under the Wage Payment Statute, the substance of the compensation, rather than the name, controls.  *Gress.*, 826 N.E.2d at 3.  Here, because the amount of compensation earned cannot be calculated until after the ten day period lapses, the sales commissions and spisf are not "wages."

The same analysis applies to the incentive-based compensation derived from the customer satisfaction survey.  The Defendant presented undisputed evidence that it did not receive the results of the customer satisfaction surveys until well after the ten day period lapsed.  Plaintiffs submit that the customer satisfaction component was a "wage" because it "was there to drive behavior and assist in focusing employees on satisfying the customer."  Pls.' Resp. at 26.  However, as in *Highhouse*, the Ten Day Rule informs the Court whether the customer satisfaction component falls under the Indiana Wage Payment Statute.  The Court concludes that it does not because Defendant could not determine whether Plaintiffs were entitled to the payment within the time allotted by the Ten Day Rule.  *Highhouse*, 807 N.E.2d at 740.

21

## C.  MANAGEMENT COMMISSIONS

As discussed above, Bender, Luedike, Trainer, and Hartley were eligible for incentive-based compensations as either Store Managers or District Level Managers depending on the success of their individual store or district.  The amount of compensation a manager received depended on the  success of the stores or districts as a whole.  In other words, the more profitable a manager's sales staff was, the better that manager's store or district would perform, and the higher that manager's incentive-based compensation would be.  However, similar to the individual sales commissions discussed above, a manager's commissions were subject to reconciliation.  Contrary to Plaintiffs' arguments, the GERS system did not negate that fact.  Thus, the commissions were linked to a contingency and Defendant could not calculate the commissions within the time allotted under the Ten Day Rule.  In addition, the managers commissions were not tied directly to work performed by them; rather, their commissions depended on the work of their sales staff.  Accordingly, the commissions were not "wages" under the Wage Payment Statute.

Finally, to the extent Plaintiffs argue that the "boost" promotions discussed above were not subject to reconciliation, Plaintiffs have not disputed Defendant's evidence that it actually complied with the Indiana Wage Payment Statute and the Ten Day Rule.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, defendant's, Sprint Nextel Corporation, Motions for Summary Judgment regarding plaintiffs, Eric Luedike, Donald Trainer, III, Debra Hartley,

and Eric Bender (Dkt. Nos. 100 and 106), are **GRANTED**.  The defendant's, Sprint Nextel Corporation, Motion for Summary Judgment regarding plaintiff, Heather Ward (Dkt. No. 103), is **GRANTED in part and DENIED in part**.

The Court hereby **SETS** this matter for a Status Conference on Friday, January 29, 2010, at 2:00 p.m., Room 204, Birch Bayh Federal Building and United States Courthouse, 46 East Ohio Street, Indianapolis, Indiana.

IT IS SO ORDERED this 19th day of January, 2010.


LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution to:

Charles B. Baldwin
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
charles.baldwin@odnss.com

Matthew S. Effland
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
matthew.effland@odnss.com

Robert F. Seidler
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
rob.seidler@ogletreedeakins.com

Ronald E. Weldy
WELDY & ASSOCIATES
weldy@weldylaw.com